Acres of Land May it please the Court, Katie Kovacs for the United States. I would urge the Court to stick to the only issue that the appellants actually raised in their opening brief in this appeal, which concerns the so-called Murray Island sales, which are just to the north of the area that was condemned on the part of their property that was not taken, that occurred three-and-a-half years after the date of taking. Now, at trial, at argument, opposing counsel has referred to sales that occurred two months after the date of taking. I think what he's referring to is actually the government's comparable sale, number 18. This is not a sale that he proffered. There is nothing in the record about that comparable sale, number 18. Why the government decided not to offer it, we have no idea. It is simply not in the record of the case. So any mention of that sale should be stricken. The Driftwood Cove sales and the Mariner's Haven sales are not in the argument in the opening brief. They are not at issue on appeal. This appeal concerns sales of the remainder of the property that were three-and-a-half years after the date of taking. Now, those sales the trial court could have excluded because they were turned over after the close of discovery. The United States never had an opportunity to determine whether they were arm's length, whether they were actually comparable, and whether they had become final. You asked if they had become final. The landowners never proffered any evidence that those sales actually became final. We do not know. There is no evidence that title ever transferred. We never had the opportunity to determine that. But instead, the trial judge allowed the landowners to testify that three-and-a-half years after the date of taking, they were able to complete the subdivision of the remainder of their property. What he didn't allow them to do was testify that they allegedly sold those one-acre lots on the remainder. And the reason he didn't do that, he said, was because they came too long after the date of taking to be probative. Now he did not say he was imposing a per se rule. He actually expressed a great deal of skepticism about a per se rule. I'd note another thing that's not in the record, unfortunately, is the pretrial conference. He made some ruling there about post-take sales. We don't know what that ruling was exactly. What we have in this record is the judge expressing a lot of skepticism about a per se rule. And then when he excludes the evidence that's at issue on appeal at page 221 of the transcript, he says, and I quote, comparable sales as far after the date of taking as these sales are, are not admissible. So I think the passage of time was dispositive to him. And he says something similar when he talks about some of the other sales, the Driftwood Cove sales. He also mentioned the passage of time. And so I don't think he was applying a per se cutoff rule. I think he was applying the general rule, which is that evidence of sales that post-date the taking are generally not admissible unless you don't have enough evidence that predates the take. So the uniform appraisal standards at page 39 state the general rule. They say if sales on or before the date of acquisition are available and adequate, there is little justification for using post-acquisition sales. And this Court has followed that general rule on at least two occasions, in 99.66 acres of land, and earlier in 4566.26 acres of land. This Court in both cases declined to allow post-taking sales to come in. So I think the district court judge here was exercising. I'm sorry? On what basis? Because the general rule is that you don't use post-take sales to prove market value on the date of taking. Again, unless there's some reason to. In a case, for example, like Brooklyn Union Gas, where the court was valuing a franchise and there was no evidence pre-take that the appraisers could use to determine market value, in that case the Second Circuit said it's okay for the appraisers to use future, potential future franchise earnings to determine market value. But the Second Circuit in that case cautioned that unlike a franchise, when you're valuing land, valuing future profits, the court said, is a capitalization merely of hopes. And so this court actually distinguished Brooklyn Union Gas and declined to allow post-take sales in that U.S. versus 4566.26 acres case. So in this case, I think the district court did express a great deal of skepticism about a per se cutoff and instead applied this general rule. But even if he did apply a per se rule in this case, his evidentiary ruling should be affirmed nonetheless because these Murray Island sales occurred too long after the date of taking. And the same thing is true of Mariner's Haven and Driftwood Cove, which aren't at issue on appeal. It's particularly true in this case, though, because the jury had ample evidence from before the date of taking to determine market value. In 320 acres of land, which is the huge Everglades decision from the Fifth Circuit, the trial court should admit as many of the most comparable sales as are necessary to fairly permit each side to present its argument to the jury. In this case, the defendants put on evidence of 33 comparable sales. That's an awful lot of comparable sales for a condemnation case. They were also allowed to testify that they thought their property was worth $33,000 on the date of taking. They were also permitted to testify that they projected that if the land hadn't been taken, they would have been able to sell it for up to $65,000. That's at page 156 of the transcript. And because their expert appraiser had been stricken, was not allowed to testify because of a Rule 26 violation, the judge was very lenient with their landowner testimony and actually allowed them to testify that they got final approval for this Murray Island subdivision that came three and a half years later on the remainder of their property. So the judge gave them a lot of leeway. There was tons of evidence in this case from before the date of taking. And so in a case like this, where market value is easily determined without this extra post-taking evidence, the district court acted within its discretion in excluding that evidence and actually would have abused his discretion if he had allowed it. That would have been contrary to 99.66 acres of land and 4,566 acres of land. He also commented, I think, correctly, that allowing parties to capitalize on future market trends, post-take market trends, would be unfair. And I think that's particularly evident given the recent downturn in the national real estate market. The United States might be able to pay landowners far less than their property was worth on the date of taking if we could present evidence of post-taking market trends. One approach is to say that market changes could affect a late and after sale. Therefore, we will exclude it completely. And another approach would be to say, well, let it end. And then if somebody wants to introduce evidence that the market's gone up or down, the jury can take that into consideration and maybe discount or add to the sale. I mean, why do we just, why don't we let the jury have more? The Fifth Circuit in that Everglades case, the 320 acres of land, discussed that particular issue about the distribution of responsibility between the judge and the jury under Rule 71A, which is now 71.1. And the court there, and I think it was the Sixth Circuit later in 27.93 acres of land also discussed that issue. And the court there said that the district court has to make an initial determination of whether the evidence should go to the jury. In a case like this, that evidence was properly excluded because it was simply too far afield, given that there was so much evidence pre-take for the jury to use to determine market value. So in the context of this case, that evidence is just too far gone, particularly because they didn't have an expert appraiser. Now, their expert might have tried to use a different kind of valuation, and he might have tried to bring in those sales after the fact to do a regression analysis, but landowners aren't qualified to do a regression analysis. And today, an oral argument opposing counsel seems to be getting into arguments that relate to evidence that their appraiser might have been able to put on if he had  But they, of course, did not raise that issue in their opening brief. So again, the only issue in this appeal, according to the opening brief, is the Murray Island sales, which were three and a half years after the date of taking. And at least in the context of this case, the trial judge properly applied the correct rule and acted within his discretion in excluding those sales because they were not probative of market value three and a half years earlier. Now, the defendants also tried to use this evidence for two other reasons. And I've wrapped up the they break out the question of whether they should have been allowed to use this evidence to rebut the government's appraiser, John McFadden. Contrary to the reply brief, I did not ignore that. It's at page 26 of our brief. It relates to using that evidence to prove market value. They tried to use the evidence for two other alternative purposes. One was to prove that the highest and best use of the property was as one-acre recreational lots. And the other was as so-called hindsight evidence to test John McFadden as the government's appraiser's testimony. And on both of those counts, the trial court said that he wouldn't allow the testimony in for these alternative purposes because he thought it would have been, quote, hopelessly confusing to the jury. He didn't think that the jury would be able to separate the purposes for which the testimony was offered that was well within his discretion and the ruling should be affirmed on that ground alone. But there are, of course, alternative reasons to affirm his rulings on highest and best use and hindsight evidence. First, the defendants didn't meet their burden of proving that the highest and best use of the property had actually changed. The law is that the current use of the property on the date of taking is presumed to be the highest and best use unless the landowner can prove that it's reasonably likely that the land will be used in the reasonably near future for, in this case, one-acre subdivision. Kennedy. It had been planned. It had been planned and it had preliminary approval, even, but it was still too speculative at the time of the taking to constitute highest and best use. First of all, there were legal impediments. The Montana Department of Environmental Quality had denied subdivision approval and, perhaps more notably, the landowners hadn't done any significant physical  So the subdivision at issue in 99.66 acres of land was much further along on the date of taking than this subdivision was. And yet, in that case, the court held that that subdivision was too speculative. And in L.E. Cook and in 2635.04 acres of land, the courts in both of those cases noted, too, that where the alternative highest and best use requires a substantial investment of capital, that also makes it speculative and, in this case, certainly too speculative to constitute the highest and best use on the date of taking. The landowners also didn't meet their burden of proving that there was market demand for more one-acre lots in this market. And, again, this case is quite similar to 2635.04 acres of land in that there was another subdivision of, quote, recreational one-acre lots in the area that they testified about and that the government's appraiser, John McFadden, explained was a far superior subdivision. That subdivision had sewer access. It had views of the lake and the mountains. It had dedicated lake access. It had a private boat ramp. This subdivision, in contrast, had none of those things. It was at least a quarter of a mile drive down a public road to a public boat ramp that doesn't even reach the water for about half of the year. So they didn't meet their burden of showing that there was market demand for more one-acre lots in this market. And so they didn't prove the court's highest and best use ruling can be affirmed on those alternative grounds. Their primary argument, really, though, is that highest and best use is an inherent attribute of the property. But this isn't a case where the property has some undiscovered, inherently valuable attribute. There is no gold on this land. The subdivision potential for the land was known on the date of taking. And subdivision was certainly possible. But under U.S. v. Olson, the Supreme Court's holding, being possible isn't enough. It has to be reasonably probable in the reasonably near future. Following 320 acres of land, that is a determination for the judge, and his ruling can be affirmed on that basis. How close were the jury's awards to the government's suggested figures? It's a good question. And they were higher than the government's suggested figures. It's hard for me to answer the question of how far they fell in between what the defendants asked for, because the record isn't clear on what they asked for. If you go to the end of the transcript of the closing arguments, it appears that counsel for the landowners had some sort of a chart that had what they were asking for written down, and he referred the jury to it. But I don't believe that I couldn't find anywhere exactly how much they were asking for that's actually in the record of the case. And I would caution the Court. Opposing counsel has referred to all sorts of things that are outside the record in the case. I don't think the record reflects exactly how much they were asking for. But they did testify. The landowners said that they thought their land was worth $33,000. So the closing argument wasn't transcribed? It was. It was transcribed. But that piece of paper that counsel was apparently referring to isn't in the record. It wasn't given as evidence. I see. He put a number on the paper. He put a number on the paper, and he pointed to it, which is, you know, a typical problem for appellate. Didn't they keep that as an exhibit? They didn't proffer it as an exhibit, so it's not in the record. But I don't think that really matters in this case, because the landowners testified they thought their property was worth $33,000. They also testified that they had projected that if the land wasn't condemned, that they would have been able to sell the lots for up to $65,000. What was the total amount offered by the government? We made an offer of proof, and I mentioned it in the brief. And I think that it was $230,000. I don't recall off the top of my head. It is in the brief. Excuse me? You said $230,000. What was the jury award? I don't remember what the total jury award was. It was about $8,000 an acre on property that had been purchased two and a half years before for only $3,000 an acre. So that's more than double, almost triple in two and a half years. Although I would remind the Court, obviously, the Fifth Amendment doesn't guarantee the landowner any return on the property. But in this case, they more than doubled, almost tripled their investment in two and a half years. The one final point is about so-called hindsight evidence. Now, the Supreme Court in Ithaca Trust, which is a tax case, rejected the use of what the landowners would call hindsight evidence, saying, tempting as it is to correct uncertain probabilities by the now certain fact, we are of the opinion that it cannot be done. And, of course, the courts have carved out some exceptions, and one of them is that Brooklyn Union gas case we talked about, which was a franchise, and there was you had to look to potential future earnings to determine the valuation. But this Court, again, distinguished that case and disallowed the government's attempt to use post-taking evidence in that U.S. versus 4,566.26 acres of land case. I would like to make one final note, just bring to the Court's attention a letter that I sent to the clerk's office about a year ago explaining how the caption of this case should be amended to comply with Rule 71a, now Rule 71.1. Lincoln County isn't actually a party to the case. It should be U.S. versus 4.85 acres of land, just to make things, you know, more numeric. Scalia. How far is this land from Libby? Kagan. Excuse me? Scalia. How far south of Libby? Kagan. Of Libby, Montana? I'm not sure. I don't know where Libby, Montana is, but this land is just outside Eureka, I believe. And I believe it's quite close to the Canadian border. I'm sure Opposing Counsel can tell you exactly where it is. I know that it is on Lake Koukounousa, which is near Eureka. Thank you so much for your time, Your Honor. Thank you. About 50 miles north of Libby, Your Honor. The answer to the question about where did the jury verdict come in, I think, is answered at the very last page of my reply brief. There were actually several parcels condemned. The subdivision parcels, the jury awarded $3,800 for one of the subdivision parcels and $5,200 for the other subdivision parcel. Now, counsel contends that we should not have been allowed to prove the highest and best use by the fact that the identical next-door neighbor property sold in the same projected time frame for the sales of these lots for $75,000 because it was speculative and is really a catch-22. You can't prove the highest and best use unless you've first proven the highest and best use. The highest and best use of this property clearly was a subdivision. Whether it was known or not, this was a gold mine. We now know it was a $75,000-per-acre gold mine. The scope of the action here on this appeal is stated in the issues in our brief. We have appealed the exclusion of all post-taking evidence, including Mariner's Haven, including Driftwood Cove. These are sales that occurred two to 14 months after. There also was an exclusion of the government's offer of Exhibit 18 or comparable 18, which was only 10 weeks after because it was a per se rule. The gravamen, I think, of the argument is that there was so much evidence of pre-taking sales that we don't need to look at the post-taking sales regardless of the purposes that they're offered for. Well, that's not how we judge evidence. Evidence is admissible if it's relevant. And this was clearly relevant on all four of these grounds, whether or not there was other relevant evidence. And that brings us to this question. Did the court exercise a per se rule or did the court say, no, these 3.5 years, that's too far away, notwithstanding I've admitted a bunch of sales that were two and a half years, 4.8 years later? There are five answers to that point. First, the court used the words on two occasions, per se. Second, the court explained three times that any sale after the taking would not be admitted and we were prohibited from even mentioning any sale if it was after the date of taking. Three. I think it does look as if, at least in several places, that's what the court did. Of course, if there was reason to exclude your evidence other than, for some other reason, that wouldn't, the fact that it said per se wouldn't cause a reversal. Exactly, Your Honor. And that's the point. That is what the trial court should have done. It should have exercised discretion. It did not. And that's what the cases that we've cited say. And this Court should not be evaluating it for the first, in the first instance. It should be saying, Judge, you applied a per se rule. That's improper. Evaluate this for its probative value. The next point is that you compare which ones he did let in. Clearly, he lets in from far more distance and proximity in time. And the court's own words are that the reason he excluded it is because it was after. And so it was clearly a per se issue. And he said that but for using that per se rule, this evidence was clearly, in his words, quote, otherwise is clearly relevant, close quote, quote, some very, very relevant, credible evidence as to what the market value really was. Let the court apply that discretion. The error of law was to apply a per se rule, excluding it no matter what the reason it was offered. Thank you. Well, aren't we supposed to look at the value of the property as of the date of taking, right? Yes, Your Honor. And you didn't have an expert to testify. There was no expert testimony. That's correct. For the landowners. What was the problem with that? Why not? The reason, we filed an appraisal report thinking that that was a Rule 26b4 disclosure. The court said it wasn't labeled a Rule 26b4 disclosure and wasn't sufficient and did not allow our expert to testify. We think that ruling was wrong but we're not appealing it. Well, if you succeeded on that ruling, that would probably get you close to what you want to do. Is that right? Well, we think the key to this case, Your Honor, is what is this property, what is it really for? Is it subdivision property or is it raw property? And we think the post-evidence sales at all these various subdivisions, especially the one next door, answers that question. And once that question is answered, we can't be talking $3,800. We can't be talking $5,200, which the jury actually awarded. That's not what the case is about. People sell property for X number of dollars and then it turns out a year later it's worth 100 times X number of dollars. Yes, Your Honor. If we were looking at a situation, if the government had offered evidence of a rapidly fluctuating and growing market, then we would have basis to exercise discretion to say we're too far removed. But you don't know whether the market's going to fluctuate or not. But unless it did grow, whether we're looking backwards or looking forwards, unless there's a change, there's no reason to distinguish this one because it's a year later or this one's because it's two years later. If you've got a steady market, you can easily show that. And that's what juries do all the time. They look at the growth in the market. It applies to before sales. It applies to after sales. There's no evidence of a rapid change, as Your Honor has suggested. In fact, exactly the opposite. We would have shown, if we had not been denied the opportunity to show it. How much did you buy the property for? How much did your client pay for it? It was something like $3,000 an acre. But we're talking about their 20-acre parcels, undeveloped and not in the use. So here we have, at the time of the taking, we have actual subdivisions. And they can be sold. And counsel suggests it's speculative whether they can be sold. They were for sale. And the only reason they couldn't be sold is the government announced, we're going to condemn these properties. How long were they on the market? Before the taking? Before the taking. They really weren't on the market. They reached exactly the point where they had the government approval that allowed them to sell it. When the government announced in the paper, we're going to condemn this property. Well, that ended that. So then they fought. They gave you the approval one day and made the announcement the next day? Pretty much, Your Honor. Pretty much. And the record will disclose exactly that sequence. And I think I've referenced it in my brief. Okay. Well, listen, you're beyond your time. I am. Thank you, Your Honor. We'll call the next matter. Next case. Lazy Y Ranch.
judges: Pregerson, Canby, Hall